Filed 1/13/26

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEVEN LOUIS MCCOWAN III,<br><br>    Defendant and Appellant. | A167545<br><br>(Contra Costa County<br>Super. Ct. No. 04002033918) |

Defendant Steven Louis McCowan III pled no contest to gun charges after the trial court denied his motion to suppress the gun and large-capacity magazine found in his vehicle following a traffic stop. McCowan asserts three main claims of error on appeal. First, he argues that his trial attorney deprived him of effective assistance of counsel when she elicited damaging testimony at the suppression hearing. Second, he contends the trial court's finding that the search of his vehicle was justified as a valid inventory search is not supported by the record. Finally, he claims that his convictions are unconstitutional following the Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*). We reject his contentions and affirm.

---

    \* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion sections A.1., A.2, A.3.

# I. BACKGROUND

## A. The Traffic Stop and Vehicle Search

In August 2021, Pittsburg Police Department Officer William Barbanica saw McCowan stopped at a gas station, and he decided to make a traffic stop. McCowan was the vehicle's sole occupant. A search of the vehicle revealed a backpack containing "a short barreled AR-style pistol" that was loaded with 13 live rounds in a large-capacity magazine. Barbanica suspected the gun was an assault rifle "because of the short barrel, the two tones, things like that, the length of the buttstock, the overall length of the rifle being well underneath 30 inches."

McCowan was charged by information with possessing an assault weapon (Pen. Code,[1] § 30605, subd. (a)), carrying a loaded firearm not registered to owner (§ 25850, subds. (a), (c)(6)), and manufacturing, importing, keeping for sale, or giving or receiving a large-capacity magazine (§ 32310, subd. (a)).

## B. The Motion to Suppress

McCowan moved to suppress the gun and magazine as the products of an illegal detention and search and seizure of his vehicle.

At the hearing on the suppression motion, the parties stipulated to the fact that McCowan's vehicle was searched without a warrant. Barbanica was the only witness called to testify. On direct examination, he testified he saw McCowan at a gas station dumping trash on the ground. He said the littering violated a local ordinance and the Penal Code. Barbanica continued to observe McCowan. At some point, he saw McCowan proceed onto the roadway and cross three traffic lanes without using a turn signal. Barbanica then initiated a traffic stop. He testified that McCowan stopped on the side

---

[1] Undesignated statutory references are to the Penal Code.

of the freeway. When asked if that was a lawful place to park, Barbanica responded in the affirmative. The trial judge interjected to note that the shoulder of the freeway was not a lawful place to park. The judge asked Barbanica if McCowan's vehicle "was at a place where the car would not have been left," to which Barbanica responded, "I would not have left it there, no, regardless."

After initiating the traffic stop, Barbanica checked the status of McCowan's driver's license through dispatch and discovered that McCowan's license was suspended. Barbanica decided to tow McCowan's vehicle because McCowan was not legally allowed to drive. Barbanica then conducted an inventory search of the vehicle and found the gun and magazine inside a backpack. The backpack was open and on the floor of the vehicle, and Barbanica testified that he believed he could see the gun "by just looking at the backpack."

On cross-examination, defense counsel confirmed with Barbanica that he did not mention a littering violation in his police report; he only mentioned a violation of Vehicle Code section 22108 for McCowan's failure to use a turn signal. Thereafter, the following line of questioning occurred regarding whether other motorists could have been affected by McCowan's driving, which is an element of Vehicle Code section 22108 (Veh. Code, §§ 22107, 22108):

"Q. When you saw the car drive off the - - out of the gas station, was there any other cars that were on the road that you observed? [¶] A. Yes. [¶] Q. Where? [¶] . . . [¶] THE WITNESS: Driving northbound on Bailey Road, that he impeded the traffic with. [¶] . . . [¶] Q. Did you indicate that in your police report? [¶] A. I don't believe I did. [¶] . . . [¶] MS. AWOLOPE: Q. So you are trained to put all the relevant information in your police report;

3

correct? [¶] A.  Yes. [¶] Q.  And nowhere in your police report did you indicate that there was another car traveling northbound, you said? [¶] A.  Yes; northbound on Bailey Road. [¶] Q.  What color was this car? [¶] A.  I believe one was black, and one was silver, if I remember correctly."  (Bold omitted.)

Shortly after this line of questioning, defense counsel asked Barbanica whether McCowan gave him consent to search McCowan's vehicle. Barbanica responded in the affirmative.  Defense counsel then asked Barbanica some final questions concerning his ability to recall past events.

Before hearing argument, the trial court advised counsel that they could "skip the littering, I'm more concerned about the traffic stop."  Defense counsel argued that Barbanica "did not indicate anything about any cars impeding" on direct examination, and that there was no information about whether the other cars on the road were "traveling from the front, from the back, how far or close were they to" McCowan's car.  The trial court interjected here, noting that Barbanica testified that McCowan "impeded the movement of those cars."  Defense counsel responded that given the lack of information about the other cars and Barbanica's failure to mention them in his report, the court should disregard Barbanica's testimony.  The prosecution did not present argument, and the parties submitted.

The trial court denied the motion to suppress, stating that if defense counsel had "simply refrained from cross-examining I would have granted your motion, because I regard the littering as pretextual, as a basis for a traffic stop, and the prosecution did not bring out either that there were other vehicles on the road, which is important to whether it is illegal to fail to use your turn signals, or, for that matter, consent to the vehicle search.  However, those were brought out by the defense."  The court concluded that McCowan's failure to use a turn signal while changing lanes provided a basis for the

4

traffic stop. The court further concluded there were "two separate bases for searching the car," McCowan's consent and an inventory search.

Following the trial court's denial of his motion to suppress, McCowan pled no contest to all counts in exchange for two years of formal probation and 90 days in jail. McCowan timely appealed, and the court granted his request for a certificate of probable cause.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

McCowan contends he received ineffective assistance of counsel at the suppression hearing when his trial counsel elicited damaging testimony from Barbanica about the presence of other motorists at the time McCowan failed to use his turn signal and McCowan's consent to the warrantless search of his vehicle. To prevail upon a claim of ineffective assistance of trial counsel, a defendant must show trial counsel's decision did not fall within the realm of reasonable tactical options and absent that decision, it is reasonably probable a result more favorable to the defense would have occurred. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.) Applied to this case, that means McCowan must show his defense counsel's decision to ask Barbanica questions regarding whether other motorists could have been affected by McCowan's lane changes and whether McCowan consented to the search of his vehicle was not a reasonable tactical decision and that had she not asked Barbanica those questions, it is reasonably probable McCowan would have received a more favorable result: suppression of the evidence and dismissal of the charges or an acquittal. (See *People v. Wharton* (1991) 53 Cal.3d 522, 576; *People v. Gonzales* (1998) 64 Cal.App.4th 432, 438.) As we will explain, we conclude that McCowan has not met his burden of establishing ineffective assistance of counsel.

5

### 1. The Law Governing Motions to Suppress

A motion to suppress should be granted if, on the facts found by the trial court, the defendant's Fourth Amendment rights have been violated. (See *People v. Glaser* (1995) 11 Cal.4th 354, 362.)  Both the Fourth Amendment to the United States Constitution and the California Constitution prohibit unreasonable searches and seizures.  (U.S. Const., 4th & 14th Amends.; Cal. Const., art. I, § 13; see *People v. Williams* (1999) 20 Cal.4th 119, 125.)  "The United States Supreme Court has interpreted the Fourth Amendment as requiring state and federal courts to exclude evidence that government officials obtained in violation of the amendment's protections."  (*Williams,* at p. 125.)

"One of [the Fourth Amendment's] protections is that a government official must obtain a warrant from a judicial officer before conducting a search or seizure."  (*People v. Williams*, *supra*, 20 Cal.4th at p. 125.)  "Warrantless searches are presumed to be unreasonable, ' "subject only to a few specifically established and well-delineated exceptions." ' "  (*People v. Evans* (2011) 200 Cal.App.4th 735, 742.)  These are " 'exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with.' "  (*Williams,* at p. 126.)  "[T]he burden of proving the justification for the warrantless search or seizure lies squarely with the prosecution."  (*People v. Johnson* (2006) 38 Cal.4th 717, 723.)

The Fourth Amendment also "dictates that traffic stops must be supported by articulable facts giving rise to a reasonable suspicion that the driver or a passenger has violated the Vehicle Code or some other law."  (*People v. Durazo* (2004) 124 Cal.App.4th 728, 731.)  Reasonable suspicion requires that "the detaining officer can point to specific articulable facts that,

6

considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) "The People have the burden to prove the detention was justified." (*People v. Benites* (1992) 9 Cal.App.4th 309, 320.)

### 2. *The Basis for the Traffic Stop*

The prosecution presented McCowan's failure to use a turn signal in violation of the Vehicle Code as a basis for the traffic stop. Facts indicating that other cars could be affected by McCowan's failure to use a turn signal were required to establish that Barbanica had a reasonable suspicion that McCowan violated the Vehicle Code. (Veh. Code, §§ 22107, 22108; *People v. Logsdon* (2008) 164 Cal.App.4th 741, 744 ["a signal is only a prerequisite to a lane change if another motorist could be affected"]; *People v. Carmona* (2011) 195 Cal.App.4th 1385, 1391–1394, overruled on other grounds as stated in *People v. Holiman* (2022) 76 Cal.App.5th 825, 832.)

Because the prosecution had failed to elicit such facts on direct examination at the suppression hearing, McCowan contends his trial counsel had no tactical reason for asking Barbanica whether there were other cars on the road at the time McCowan changed lanes without using his turn signal and where he saw those cars, and thus she rendered ineffective assistance of counsel. The People respond that McCowan has not established that defense counsel's performance was constitutionally deficient because defense counsel had a tactical reason for asking about the other motorists, which was to discredit Barbanica.

We conclude that, on the limited record before us, McCowan's ineffective assistance claim is more properly reviewed by way of a petition for writ of habeas corpus. As our Supreme Court explained, it is generally

7

"inappropriate for an appellate court to speculate as to the existence or nonexistence of a tactical basis for a defense attorney's course of conduct when the record on appeal does not illuminate the basis for the attorney's challenged acts or omissions, [so] a claim of ineffective assistance is more appropriately made in a habeas corpus proceeding, in which the attorney has the opportunity to explain the reasons for his or her conduct. 'Having afforded the trial attorney an opportunity to explain, courts are in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence.' " (*People v. Wilson* (1992) 3 Cal.4th 926, 936; see *People v. Diaz* (1992) 3 Cal.4th 495, 557–558 ["When . . . the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons."].) As such, appellate courts will reverse a conviction for ineffective assistance on direct appeal "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The record does not disclose why defense counsel decided to ask Barbanica questions regarding whether other motorists could have been affected by McCowan's lane changes, and it is not altogether clear whether there could have been a reasonable tactical explanation for defense counsel asking Barbanica those questions. Thus, on the current record, we choose to follow the course suggested by our Supreme Court and conclude that McCowan has not satisfied any of the conditions listed in *People v. Mai* in a way that allows us to be "truly confident all the relevant facts have been developed" regarding his ineffective assistance of counsel claim. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.)

8

### 3. The Justification for the Vehicle Search

McCowan also claims his trial counsel rendered ineffective assistance of counsel by asking Barbanica at the suppression hearing whether, as a justification for the warrantless search of his vehicle, McCowan consented to the search. Without deciding whether trial counsel's performance was deficient, we reject McCowan's second ineffective assistance claim on the ground that his counsel's asserted deficiency was not prejudicial. (See *In re Crew* (2011) 52 Cal.4th 126, 150 ["If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient."].) McCowan's consent was one of two justifications cited by the trial court for the vehicle search, the other being an inventory search. Thus, even if trial counsel had refrained from asking Barbanica about McCowan's consent to the search of his vehicle, the court would have still concluded that a proper basis for the search existed.

Acknowledging that the trial court cited the inventory search as an independent justification for the vehicle search, McCowan argues that the court erred in concluding that the search of his vehicle was a valid inventory search. We disagree.

"Inventory searches are a well-defined exception to the Fourth Amendment's warrant requirement. [Citation.] When a vehicle is impounded or otherwise in lawful police custody, an officer may conduct a warrantless search aimed at securing or protecting the vehicle and its contents." (*People v. Lee* (2019) 40 Cal.App.5th 853, 867 (*Lee*).)

"To determine whether a warrantless search is properly characterized as an inventory search, 'we focus on the purpose of the impound rather than the purpose of the inventory.'" (*Lee*, *supra*, 40 Cal.App.5th at p. 867.) In

9

deciding whether the decision to impound a vehicle was justified, we have to determine whether the impoundment was reasonable under " 'all the circumstances.' " (*South Dakota v. Opperman* (1976) 428 U.S. 364, 373; see *Miranda v. City of Cornelius* (9th Cir. 2005) 429 F.3d 858, 862; *People v. Trejo* (1994) 26 Cal.App.4th 460, 462–463.)  While the Vehicle Code authorized Barbanica to impound McCowan's car, McCowan correctly notes that this authorization was insufficient on its own to support the reasonableness of the impoundment.  (See *People v. Williams* (2006) 145 Cal.App.4th 756, 762; *Miranda*, at p. 864; *People v. Torres* (2010) 188 Cal.App.4th 775, 790 [" 'statutory authorization [to impound a vehicle] does not, in and of itself, determine the constitutional reasonableness' of an inventory search"].)

In evaluating the lawfulness of an inventory search, we evaluate "both the objective reasonableness of the impound decision and the subjective intent of the impounding officer to determine whether the decision to impound was 'motivated by an improper investigatory purpose.' " (*Lee*, *supra*, 40 Cal.App.5th at p. 867; *People v. Torres*, *supra*, 188 Cal.App.4th at pp. 789–790.)

To be objectively reasonable, the law enforcement officer's decision to impound must serve a community caretaking function, such as "when a vehicle is parked illegally, blocks traffic or passage, or stands at risk of theft or vandalism." (*Lee*, *supra*, 40 Cal.App.5th at p. 867.)  "Also relevant to the caretaking inquiry is whether someone other than the defendant could remove the car to a safe location." (*Ibid.*)  However, a law enforcement officer is not required to adopt the least intrusive measure in deciding to impound a vehicle.  (*Colorado v. Bertine* (1987) 479 U.S. 367, 374; *People v. Williams*, *supra*, 145 Cal.App.4th at p. 761.)

10

McCowan contends there is no substantial evidence to support the trial court's finding that Barbanica's decision to impound his vehicle served a valid community caretaker function. He points to Barbanica's testimony that McCowan parked his car where it was lawful to park and Barbanica's failure to mention any facts indicating whether items in the vehicle were at risk of being stolen. He further notes that Barbanica decided to impound the vehicle as soon as he discovered McCowan's license was suspended and did not consider other alternatives to impoundment, such as whether someone else could have driven the car.

We agree with McCowan that aspects of Barbanica's testimony, including his claim that McCowan was parked legally, undercut the safekeeping rationale for the impoundment. (See *U.S. v. Caseres* (9th Cir. 2008) 533 F.3d 1064, 1074–1075 ["[t]here was no community caretaking rationale for the impoundment" when "[t]he car was legally parked at the curb of a residential street two houses away from [the defendant's] home"]; *U.S. v. Squires* (2d. Cir. 1972) 456 F.2d 967, 970 ["officers did not have a reasonable basis for concluding that it was necessary to [impound the car] in order to protect it," when the car was parked in a parking lot behind the defendant's apartment complex]; *People v. Torres*, *supra*, 188 Cal.App.4th at p. 792 ["Federal cases underscore the impounding of a vehicle driven by an unlicensed driver must be supported by some community caretaking function other than temporarily depriving the driver of the use of the vehicle."].)

Ultimately, however, we are not persuaded that the impoundment was unreasonable under all relevant circumstances. Barbanica pulled McCowan over for a traffic violation. He testified that McCowan parked his vehicle on the shoulder of a freeway, which the trial court noted was not a legal place to park. The court asked Barbanica whether that location was "a place where

11

the car would not have been left," to which Barbanica responded, "I would not have left it there, no." Barbanica decided to impound the vehicle only after he discovered that McCowan had a suspended license. There was no evidence that someone else was immediately available to assume responsibility for the vehicle. (See *People v. Green* (1996) 46 Cal.App.4th 367, 373 [where no person available to take control of car, officers may impound it].) Finally, there was no affirmative indication that the decision to impound the car was pretextual.[2] (See *id.*, at p. 374 [upholding impound and subsequent inventory search since "[t]here is no indication that the inventory search of the car was merely a 'ruse' to try to discover evidence of criminal activity"]; *People v. Burch* (1986) 188 Cal.App.3d 172, 175, 180 [officer testified he intended to cite the defendant for a suspended license and conducted an inventory search of the car prior to impounding it; court noted in upholding the inventory search that there was no credible evidence the inventory search was simply a ruse to justify an investigatory search for criminal evidence].)

In sum, although this may be a close issue, the impoundment was reasonable under the totality of the circumstances. Thus, the inventory search was a valid justification for the search of McCowan's vehicle, and his trial counsel's decision to ask Barbanica whether McCowan consented to the search was therefore not prejudicial.

---

[2] McCowan argues that an "actual inventory of the car's contents does not appear to have been made," which he believes implies an investigatory motive for the search. However, Barbanica testified that he conducted an inventory search of McCowan's vehicle because he is instructed, as an officer with the Pittsburg Police Department, to conduct an inventory search of an impounded car to "document any items inside the vehicle."

## B. Constitutionality of California's Firearm Regulations

McCowan next contends that his convictions must be reversed on the ground that California's firearm licensing scheme and sections 25850, 30605, and 32310 are unconstitutional under *Bruen*, *supra*, 597 U.S. 1.[3] As we will explain, we disagree that reversal is required here for any of McCowan's convictions.

### 1. *The Second Amendment Under* Bruen

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Based on this language, the United States Supreme Court first identified a constitutionally protected right to possession of handguns in the home in *District of Columbia v. Heller (*2008) 554 U.S. 570, 635 (*Heller*). (*In re D.L.* (2023) 93 Cal.App.5th 144, 150 (*D.L.*).) In doing so, however, *Heller* affirmed the constitutionality of many "longstanding" and "presumptively lawful" regulatory restrictions on the right to bear arms, including prohibitions on the possession of firearms by felons and the mentally ill, the carrying of firearms in "sensitive places" such as schools, and laws "imposing conditions and qualifications on the commercial sale of arms." (*Heller*, at pp. 626–627 & fn. 26.)

The United States Supreme Court has since held "that the due process clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*. The *Heller* majority's interpretation of the Second

---

[3] McCowan filed a non-statutory motion to dismiss in the trial court, alleging that California's firearm licensing scheme was unconstitutional under *Bruen*. The trial court denied the motion.

Amendment thus applies equally 'to both the Federal Government and the States.'" (*D.L.*, *supra*, 93 Cal.App.5th at p. 151.)

In 2022, *Bruen* held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home" and considered the constitutionality of New York's concealed carry licensing scheme and specifically the requirement that an applicant show "'proper cause'" for a license. (*Bruen, supra*, 597 U.S. at pp. 10, 11.) "Prior to *Bruen*, an applicant had to prove '"proper cause exists"' to issue the license. [Citation.] In other words, an applicant had to 'demonstrate[] a special need for self-defense.' [Citation.] *Bruen* noted that six other states, including California, had similar 'proper cause' requirements in their concealed carry licensing frameworks." (*D.L.*, *supra*, 93 Cal.App.5th at p. 152.)

*Bruen* concluded that the Second Amendment's "plain text" covered the petitioners' "proposed course of conduct—carrying handguns publicly for self-defense." (*Bruen*, *supra*, 597 U.S. at pp. 17, 32.) *Bruen* further concluded that the challenged firearm regulation must be "consistent with this Nation's historical tradition" to pass muster under the Second Amendment. (*D.L.*, *supra*, 93 Cal.App.5th at p. 152.) "In other words, conduct that falls within the 'plain text' of the Second Amendment may be protected unless the government can identify an 'American tradition' justifying the regulation." (*D.L.,* at pp. 152-153.) "The *Bruen* majority concluded that New York did not meet its burden to identify an 'American tradition' justifying its 'proper cause' language, and concluded the requirement was unconstitutional." (*D.L.*, at p. 153.)

*Bruen* thus established a two-part test for analyzing Second Amendment challenges. At *Bruen* "[s]tep one," courts must determine

whether "the Second Amendment's plain text covers an individual's conduct." (*Bruen*, *supra*, 597 U.S. at pp. 19, 24.)  At this step, the *Bruen* court looked to whether the petitioners were "part of 'the people' whom the Second Amendment protects," whether the weapon at issue was " 'in common use' today for self-defense," and whether the parties' "proposed course of conduct" fell within the Second Amendment.  (*Bruen*, at pp. 31–32, citing *Heller*, *supra*, 554 U.S. at pp. 580, 627.)

If *Bruen* step one is satisfied, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  (*Bruen*, *supra*, 597 U.S. at p. 24.)  At the second *Bruen* step, the challenged law need not "precisely match its historical precursors" so long as it is " 'analogous enough to pass constitutional muster.' "  (*United States v. Rahimi* (2024) 602 U.S. 680, 692.)  Under the principle that parties " 'are responsible for advancing the facts and argument entitling them to relief' " (*United States v. Sineneng-Smith* (2020) 590 U.S. 371, 375–376), "[c]ourts are . . . entitled to decide a case based on the historical record compiled by the parties."  (*Bruen*, at p. 25, fn. 6.)

## 2. *Standards for Review*

The question of whether California's firearm licensing scheme and sections 25850, 30605, and 32310 violate the right to bear arms guaranteed by the Second and Fourteenth Amendments to the United States Constitution is a question of law which we review de novo.  (See *Valley Baptist Church v. City of San Rafael* (2021) 61 Cal.App.5th 401, 410 [an appellate court reviews "questions of law and constitutional interpretation de novo"].)  However, " ' "[a] defendant challenging the constitutionality of a statute carries a heavy burden: 'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and

15

unmistakably appears; all presumptions and intendments favor its validity.' " ' [Citations.] Typically, a litigant may challenge the constitutionality of a statute in two ways: on its face or as applied." (*D.L.*, *supra*, 93 Cal.App.5th at pp. 156–157.)

Here, McCowan is asserting a facial challenge to the constitutionality of California's firearm licensing scheme and sections 25850, 30605, and 32310. " 'A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual.' [Citation.] A facial challenge seeks to void the statute as a whole by showing that ' "no set of circumstances exists under which the Act would be valid," *i.e.*, that the law is unconstitutional in all of its applications.' " (*D.L.*, *supra*, 93 Cal.App.5th at p. 157; see *In re T.F.-G.* (2023) 94 Cal.App.5th 893, 909 [a "facial constitutional challenge requires a showing that the statute poses a ' " 'total and fatal conflict with applicable constitutional prohibitions' " ' or at least 'is invalid "in the *generality* or *great majority* of cases" ' "].) "Put another way, 'a facial challenge must fail where the statute has a " 'plainly legitimate sweep.' " ' " (*D.L.*, at p. 157.)

### 3. *Constitutionality of Section 25850 and California's Firearm Licensing Scheme*

McCowan contends his conviction for carrying a loaded firearm not registered to owner under section 25850 must be reversed because California's firearm licensing scheme is facially unconstitutional under *Bruen*. Assuming McCowan has standing to raise this argument (see *D.L.*, *supra*, 93 Cal.App.5th at pp. 159–162), we reject it.

Section 25850, subdivision (a) provides that "[a] person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the

16

person or in a vehicle while in any public place or on any public street in an incorporated city, city and county, or in any public place or on any public street in a prohibited area of an unincorporated area of a county or city and county." Section 25850, subdivision (c)(6) sets forth the punishment for a violation of section 25850, subdivision (a) by a person who has not registered the firearm.

"Although framed as a default prohibition, section 25850 is in effect the enforcement mechanism of a regulatory regime that grants licenses to those who may lawfully carry firearms and withholds licenses from those who may not." (*In re T.F.-G.*, *supra*, 94 Cal.App.5th at p. 915.) On its own, section 25850 "appears broadly prohibitory, [but] it exists within a framework of numerous express exemptions." (*In re T.F.-G.*, at p. 908.) Among those exemptions is section 26010, which provides that section 25850 "does not apply to the carrying of any handgun by any person as authorized pursuant to" section 26150 et seq.

Sections 26150 and 26155 set forth California's requirements for obtaining a license to carry a concealed firearm. At the time of McCowan's offense, former section 26150 provided that the sheriff of a county "may issue" a license to a person upon proof of the following: (1) the applicant is "of good moral character"; (2) "[g]ood cause exists for issuance of the license"; (3) the applicant is a resident of the county in which they are seeking the license; and (4) the applicant completed a firearms training course. (Former § 26150, subd. (a), added by Stats. 2010, ch. 711, § 6 and amended by Stats. 2015, ch. 785, § 2, eff. January 1, 2016 (hereafter former section 26150).)[4]

_____

[4] Further amendments to sections 26150 and 26155 took effect on January 1, 2026. Those amendments are not relevant to the issues raised in this appeal, as they concern firearm licensing requirements for non-California residents. (Stats. 2025, ch. 570, §§ 2, 3.)

In addition to setting forth the requirements for obtaining a concealed carry license, former section 26150 states that the sheriff "may issue" an open carry license to individuals living in counties with a population of less than 200,000 people according to the most recent federal census. (Former § 26150, subd. (b)(2).) Thus, individuals with an open carry license are also exempt from section 25850 under section 26010.

After the United States Supreme Court issued its decision in *Bruen*, the Legislature amended former section 26150, subdivision (a) and, as relevant to this appeal, removed the "[g]ood cause" and "good moral character" licensing requirements and changed the "may issue" language to "shall issue." (Stats. 2023, ch. 249, § 10, eff. January 1, 2024.)

McCowan makes several arguments challenging the constitutionality of this licensing scheme, each of which we consider in turn.

### a. The "Good Cause" Requirement

McCowan claims California's firearm licensing scheme was facially unconstitutional at the time of his offense because of the "good cause" licensing requirement in former section 26150. (Former § 26150, subd. (a)(2).) Numerous decisions have uniformly rejected the contention that California's licensing scheme as a whole is unconstitutional based on the "good cause" requirement, instead concluding that the requirement was severable. (See *D.L.*, *supra*, 93 Cal.App.5th at pp. 163–164; *In re T.F.-G.*, *supra*, 94 Cal.App.5th at p. 916; *People v. Anderson* (2024) 104 Cal.App.5th 577, 601; *People v. Mosqueda* (2023) 97 Cal.App.5th 399, 408–409.) These cases hold that after the "good cause" requirement is severed, a defendant's facial challenge to California's firearm licensing scheme will succeed only if he or she shows that the remaining licensing requirements "pose a present

18

total and fatal conflict with applicable constitutional prohibitions." (*D.L.*, at pp. 166–167; see *In re T.F.-G.*, at pp. 917–918.)

McCowan does not dispute that the "good cause" requirement is severable but argues that such separation cannot be applied retroactively to his offense. In *D.L.*, the defendant made a similar argument, alleging "that severability does not cure the harm suffered from his pre-*Bruen* conviction." (*D.L.*, *supra*, 93 Cal.App.5th at p. 165.) The *D.L.* court rejected the argument, concluding that it "could only make sense in the context of an 'as applied' challenge." (*Ibid.*)

McCowan urges us to depart with *D.L.* on this point. He claims *D.L.* ignored contrary holdings in *Smith v. Cahoon* (1931) 283 U.S. 553, *In re Porterfield* (1946) 28 Cal.2d 91, and *Shuttlesworth v. Birmingham* (1969) 394 U.S. 147 regarding the retroactive application of the severability doctrine. Those cases are distinguishable, however. *Smith* and *Porterfield* involved "as applied" challenges to the statutes at issue, not facial challenges. (*Smith*, at p. 556; *In re Porterfield*, at p. 96.) Moreover, as the *D.L.* court observed, *Smith* is distinguishable because the remainder of the statute at issue there would have been " 'void for uncertainty' " if the unconstitutional provision was severed. (*D.L.*, *supra*, 93 Cal.App.5th at p. 164, citing *Smith*, at p. 564.) "Here, unlike *Smith*, a valid firearm licensing framework remains even if the 'good cause' requirement is severed." (*D.L.*, at p. 165.)

In *Shuttlesworth*, the defendant was convicted of violating an ordinance that prohibited public demonstration without first obtaining a permit from the city. (*Shuttlesworth v. Birmingham*, *supra*, 394 U.S. at p. 148.) After the Alabama Supreme Court affirmed the conviction, the United States Supreme Court held that the ordinance was unconstitutional under longstanding precedent that prohibited prior restraints on First Amendment rights

19

"without narrow, objective, and definite standards to guide the licensing authority." (*Id.* at pp. 150–151.) While the Alabama Supreme Court "performed a remarkable job of plastic surgery upon the face of the ordinance" to render it constitutional, the Court found that "[i]t would have taken extraordinary clairvoyance for anyone to perceive that [the ordinance] meant what the Supreme Court of Alabama was destined to find that it meant more than four years later; and, with First Amendment rights hanging in the balance, we would hesitate long before assuming that either the members of [the city] or the [defendant] possessed any such clairvoyance" at the time of the defendant's offense. (*Id.* at pp. 153, 156.)

The ordinance at issue in *Shuttlesworth* passed constitutional scrutiny only after extensive revisions by the Alabama Supreme Court left it with an "extraordinarily narrow construction" that could not have been anticipated. (*Shuttlesworth v. Birmingham, supra*, 394 U.S. at p. 150.) Under those circumstances, the court indicated the defendant could ignore the ordinance and engage in the restricted conduct "with impunity." (*Id.* at p. 151.) Here, in contrast, California's firearm licensing scheme did not require extensive redrafting to conform to *Bruen* since only one of several licensing requirements needed to be severed. As such, individuals were not free to disregard the other licensing requirements and engage in the unlicensed public carry of a firearm even if severing the "good cause" requirement did not have retroactive effect. Therefore, *Shuttlesworth* does not support McCowan's facial challenge to the constitutionality of California's firearm licensing scheme. McCowan has thus failed to demonstrate that the "good cause" requirement rendered California's firearm licensing scheme unconstitutional on its face at the time of his offense.

### b. The "Good Moral Character" Requirement

McCowan also challenges the "good moral character" licensing requirement. (Former § 26150, subd. (a)(1).) He contends this requirement is similar to the "proper cause" requirement rejected by *Bruen*.

Even if the "good moral character" requirement was unconstitutional at the time of McCowan's offense, it, like the "good cause" requirement, is grammatically, functionally, and volitionally severable. (See *People v. Mosqueda*, *supra*, 97 Cal.App.5th at p. 411.) "It is contained in a discrete subdivision, subdivision (a)(1) of section 26150; the remaining provisions can be applied independently; and the Legislature evidenced its intent that the clause be separable." (*Ibid.*, citing *D.L.*, *supra*, 93 Cal.App.5th at pp. 163–165.)

McCowan does not challenge the remaining licensing conditions. (See former § 26150, subd. (a).) As such, McCowan's facial challenge falls short of demonstrating that "the remaining licensing conditions render section 25850 unconstitutional at least 'in the generality or great majority of cases.' " (*In re T.F.-G.*, *supra*, 94 Cal.App.5th at p. 916.)

### c. Former Section 26150's "May Issue" Language

McCowan argues that even if the "good cause" and "good moral character" licensing requirements are retroactively severable, the rest of California's firearm licensing scheme was unconstitutional at the time of his convictions based on the language in former section 26150 stating that the sheriff "may issue" a license, which McCowan asserts gives " 'unfettered discretion' " to licensing officials. He further contends we should not follow *D.L.* because it "ignores that *Bruen* specifically distinguished the 43 'shall issue' jurisdictions from" the states that "have 'may issue' licensing laws."

The *D.L.* court, however, rejected a similar argument as "not supported by the actual holding in *Bruen*," which was "based on the 'proper cause' language in the New York statute, not on its use of the phrase 'may issue.'" (*D.L.*, *supra*, 93 Cal.App.5th at p. 166, citing *Bruen*, *supra*, 507 U.S. at pp. 31, 71.) *D.L.* further concluded that this argument constituted an "as applied" constitutional challenge because it "would not apply in all circumstances. [Citation.] Rather, it would only apply where the sheriff or police chief refused to issue a license without articulating a reason for the rejection." (*D.L.*, at p. 167.)

McCowan does not persuade us that *D.L.* was wrongly decided. Although the *Bruen* court expressed concern with open-ended discretion of licensing officials, its concern focused on the "proper cause" requirement in New York's licensing scheme because it allowed licensing officials to subjectively evaluate the applicant's special need for self-defense, and the right to bear arms for self-defense is the very right protected by the Second Amendment. (See *Bruen*, *supra*, 597 U.S. at p. 70 ["[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right'"]; *id.* at pp. 11, 13–15 [comparing "shall issue" jurisdictions, where the issuance of a concealed-carry license is mandated upon satisfaction of stated requirements, "without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability," with New York's "may issue" scheme]; *id.* at p. 38 [concluding there is no historical tradition of limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense].) In rejecting New York's "proper cause" licensing requirement, the *Bruen* court explained, "We know of no other constitutional right that an

individual may exercise only after demonstrating to government officers some special need."[5] (*Id.* at p. 70.)

Additionally, " '[w]henever possible, statutes are to be interpreted as consistent with applicable constitutional provisions so as to harmonize both.' " (*S&S Cummins Corp. v. West Bay Builders, Inc.* (2008) 159 Cal.App.4th 765, 780.) Applying that principle here, we note that the term "may" does not always denote a grant of discretion. (See *Boam v. Trident Financial Corp.* (1992) 6 Cal.App.4th 738, 743–744.) Thus, absent an as applied challenge, we construe the firearm licensing statutes as mandating issuance of a license if the remaining requirements are met. (See *Baird v. Bonta* (E.D.Cal. 2023) 709 F.Supp.3d 1091, 1124–1125 [rejecting argument that California's licensing system is unconstitutional because of the "may-issue" language], citing *Bruen, supra,* 597 U.S. at p. 13, fn. 1, and reversed on other grounds by *Baird v. Bonta* (9th Cir. Jan. 2, 2026, No. 24-565) 2026 U.S.App.Lexis 44, at *5–6.)

### d. Section 25850's Open Carry Prohibition

Finally, McCowan argues that California's firearm licensing scheme frustrates the " 'right to bear arms by enacting first a concealed weapons licensing scheme that is tantamount to a complete ban on concealed weapons, and then by enacting an open carry ban.' " Relying on *People v. Miller* (2023) 94 Cal.App.5th 935 (*Miller*) and *Bruen, supra,* 597 U.S. at page 8, he asserts that "if a state banned both open and concealed carry, it was the open carry prohibition that conflicted with the constitution and was void." (Italics

---

[5] McCowan asserts that Justice Kavanaugh's concurrence in *Bruen* supports his position that "may issue" licensing regimes are unconstitutional. Because Justice Kavanaugh's concurrence does not constitute binding precedent (*Maryland v. Wilson* (1997) 519 U.S. 408, 412–413), it does not invalidate "may issue" licensing regimes.

23

omitted.)  From this McCowan concludes that section 25850's open carry prohibition is unconstitutional under the Second Amendment.  Neither *Miller* nor *Bruen* support his conclusion.

In *Bruen*, at the second step of the analysis, the Court examined several historical public carry restrictions presented by respondents as potential analogues to the challenged licensing regime.  (*Bruen, supra*, 597 U.S. at pp. 50–60.)  Some of the laws prohibited concealed carry, and respondents asserted that those statutes were evidence that states were "historically free to ban public carry." (*Id.* at pp. 52–53.)  The Court disagreed, finding instead that "the history reveals a consensus that States could *not* ban public carry altogether." (*Id.* at p. 53.)  Rather, "[r]espondents' cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit open carry." (*Ibid.*)  "All told, these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues." (*Id.* at p. 55.)

Thus, *Bruen* recognized that historically, if a state completely banned public carry, it was the open carry prohibition that conflicted with the constitution and was void.  (*Bruen, supra*, 597 U.S. at pp. 52–53.)  But *Bruen* did not determine whether licensing schemes were tantamount to a ban on public carry.  To the contrary, Justice Kavanaugh's concurrence appears to endorse "shall-issue" licensing schemes.  (*Id.* at p. 80 (conc. opn. of Kavanaugh, J.) ["Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."].)  Nor did *Bruen* suggest that a state could not regulate both open carry and concealed carry where the state did not completely ban public carry.  To so hold and require open carry without

24

restrictions would mean that regulations designed to ensure that only "ordinary, law-abiding citizens" are carrying handguns in public would be ineffective. (*Bruen*, at p. 9; see *id*. at p. 72 (conc. opn. of Alito, J.) ["Our holding decides nothing about who may lawfully possess a firearm. . . . Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 . . . (2010), about restrictions that may be imposed on the possession or carrying of guns."]; *id*. at p. 70 ["[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public *subject to certain reasonable, well-defined restrictions*" (italics added)].) We therefore decline to read into *Bruen* a prohibition against states regulating open carry if those states also impose licensing requirements for concealed carry.

The defendant in *Miller* claimed that the concealed carry prohibitions in section 25400 were unconstitutional, and he relied on *Bruen*'s recognition of a historical understanding that concealed carry prohibitions were constitutional if a state did not similarly prohibit open carry. (*Miller*, *supra*, 94 Cal.App.5th at p. 946.) The *Miller* court concluded that those citations to *Bruen* did not support the defendant's argument, since *Bruen* was quoting a Georgia case explaining that if a statute prohibited both concealed carry and open carry, "it was the *open* carry provision that conflicted with the Constitution and was void." (*Miller*, at p. 946.) "[The defendant]'s arguments that California's licensing scheme is invalid, if meritorious, would suggest other statutes such as the open carry prohibitions in sections 25850 and 26350 are unconstitutional, but the concealed carry prohibitions in section 25400 would remain valid post-*Bruen* because California would effectively no longer ban open carry." (*Miller,* at p. 946.)

25

*Miller* is not authority for McCowan's argument because it did not determine whether section 25850's open carry prohibition is unconstitutional. "[I]t is axiomatic that a decision does not stand for a proposition not considered by the court." (*People v. Barker* (2004) 34 Cal.4th 345, 354.) Moreover, *Miller* suggests that the open carry prohibition would be unconstitutional only if California's licensing scheme was unconstitutional. (See *Miller*, *supra*, 94 Cal.App.5th at p. 946.)

Further, neither *Miller* nor McCowan acknowledge that individuals residing in certain counties in California can obtain an open carry license (§ 26150, subd. (b)(2)), and that section 25850 is the enforcement mechanism for both the open carry and concealed carry licensing regulations (§ 26010; *In re T.F.-G.*, *supra*, 94 Cal.App.5th at p. 913). Because McCowan is bringing a facial challenge to section 25850, he needs to show either that "a particular licensing condition renders the entire licensing regime unconstitutional," that the Second Amendment bars states from requiring licenses at all, or that the licensing conditions render section 25850 unconstitutional in the great majority of cases. (*In re T.F.-G.*, at p. 916; see also *id.* at p. 917, fn. 21 ["T.F.-G.'s facial challenge to the enforcement mechanism, as opposed to a particular licensing restriction, would render the first step of the *Bruen* framework a nullity."].) As McCowan offers no other authority or analysis in his opening brief to support his challenge to section 25850's open carry prohibition, he has not established that this provision is unconstitutional under the Second Amendment.[6]

---

[6] On January 2, 2026, the Ninth Circuit Court of Appeals issued a decision in *Baird v. Bonta*, *supra*, 2026 U.S.App.Lexis 44, in which the defendant argued that California's ban on open carry in counties with populations greater than 200,000 was facially unconstitutional under the Second Amendment (*id.* at pp. *13–14). Applying the two-step *Bruen* test,

26

McCowan attempts to demonstrate the unconstitutionality of section 25850's open carry prohibition in his reply brief by applying the two-step *Bruen* test, but it is too late. "We disregard issues not properly addressed in the appellant's opening brief." (*Aviel v. Ng* (2008) 161 Cal.App.4th 809, 821; see *People v. Tully* (2012) 54 Cal.4th 952, 1075.)

For the foregoing reasons, we reject McCowan's facial challenge to section 25850 and California's firearm licensing scheme.

### 4. *Constitutionality of Section 30605*

McCowan was also convicted under section 30605, subdivision (a), for possessing an assault weapon, which is defined by the Penal Code as including certain types of semiautomatic firearms. (§§ 30510, 30515.) McCowan argues that this provision violates the Second Amendment because possession of assault weapons is protected conduct under the plain text of the Second Amendment, and there is no historical tradition of prohibiting possession of assault weapons. Several courts in this state have rejected similar arguments. (*People v. James* (2009) 174 Cal.App.4th 662, 676–677 (*James*); *People v. Zondorak* (2013) 220 Cal.App.4th 829, 836–838 (*Zondorak*); *People v. Bocanegra* (2023) 90 Cal.App.5th 1236, 1250–1251 (*Bocanegra*); *People v. Crenshaw* (2025) 116 Cal.App.5th 1169, 1176–1179.) We see no reason to disturb these decisions' unanimous conclusion that the Second Amendment does not protect the possession of assault weapons.

---

the majority agreed with the defendant, concluding that California failed to satisfy its burden to present evidence of a relevant historical tradition of firearm regulation. (*Id.* at p. *30.) *Baird* is not binding on us (*Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 879), and it does not change the outcome anyway because McCowan failed to meet his appellate burden of demonstrating error.

Not all weapons constitute "Arms" protected by the Second Amendment. The Supreme Court in *United States v. Miller* (1939) 307 U.S. 174 held that "the sorts of weapons protected" by the Second Amendment are those that were " 'in common use at the time.' " (*Heller*, *supra*, 554 U.S. at p. 627, citing *United States v. Miller*, at p. 179.) In *United States v. Miller*, the Court upheld the defendants' federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce because there was no "evidence tending to show that possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia." (*Id.* at p. 178.) Thus, the Court could not conclude "that the Second Amendment guarantees the right to keep and bear such an instrument." (*Ibid.*)

Interpreting *United States v. Miller*'s common-use limitation, *Heller* explained that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." (*Heller*, *supra*, 554 U.S. at p. 625.) Recognizing the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " it explained that the constitutional right to bear arms is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Id.* at pp. 626, 627.) The Court presented two examples of such "dangerous and unusual weapons"—the short-barreled shotgun at issue in its decision in *United States v. Miller* and "weapons that are most useful in military service--M-16 rifles and the like." (*Heller*, at pp. 625, 627.) In contrast to those weapons, the *Heller* court concluded that handguns were the sort of "arms" protected by the Second Amendment, noting that there were "many reasons that a citizen may prefer a handgun for home defense," including that

handguns are "easier to store in a location that is readily accessible in an emergency." (*Id.* at p. 629.)

Following *Heller*, *James* and *Zondorak* held that the Second Amendment does not extend protection to assault weapons. (*James*, *supra*, 174 Cal.App.4th at p. 676.) The *James* court reasoned that assault weapons—which have " 'a high rate of fire and capacity for firepower' "—"are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war." (*James*, at p. 676.) The *Zondorak* court agreed with *James* that assault weapons " 'are at least as dangerous and unusual as the short-barreled shotgun' [citation], which [*United States v.*] *Miller* concluded (with apparent approval from *Heller*) was outside the scope of the Second Amendment's guarantee." (*Zondorak*, *supra*, 220 Cal.App.4th at p. 836.)

After *Bruen* was decided, *Bocanegra* and *People v. Crenshaw* reaffirmed the holding in *James* and *Zondorak* that the Second Amendment's "plain text" does not cover the possession of assault weapons. (*Bocanegra*, *supra*, 90 Cal.App.5th at pp. 1250–1251; see *People v. Crenshaw*, *supra*, 116 Cal.App.5th at pp. 1176–1179.) The *Bocanegra* court concluded that *Bruen* did not change the analysis for Second Amendment claims, but rather was "clarif[ying] the contours of *Heller*." (*Bocanegra*, at p. 1255; see *Bruen*, *supra*, 597 U.S. at p. 31 ["Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement."].) In doing so, the *Bruen* court reiterated that the first step in evaluating whether a firearm regulation violates the Second Amendment is to determine whether "the Second Amendment's plain text covers an individual's conduct." (*Id.* at p. 17.)

29

McCowan contends, without citing any authority, that the plain text of the Second Amendment covers the possession of assault weapons because they constitute " 'Arms.' "  As a result, he asserts, the possession of assault weapons is presumptively protected by the Second Amendment, and the government had the burden of proving that there is a historical tradition of prohibiting the possession of assault weapons.  McCowan's approach is contrary to that in *Bruen*, where the Court determined at step one of the analysis whether the party challenging the firearm regulation was "part of 'the people' whom the Second Amendment protects," whether the weapon at issue was " 'in common use' today for self-defense," and whether the "proposed course of conduct" fell within the Second Amendment.  (*Bruen*, *supra*, 597 U.S. at pp. 31–32, citing *Heller*, *supra*, 554 U.S. at pp. 580, 627; see *United States v. Alaniz* (9th Cir. 2023) 69 F.4th 1124, 1128 [concluding that the " ' "common use" ' " issue belongs at *Bruen* step one].)  Only once this first step is satisfied does the burden shift to the government to justify its regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  (*Bruen*, at p. 24.)

In his reply, McCowan cites the dissent in a recent Ninth Circuit case, *Duncan v. Bonta* (9th Cir. 2025) 133 F.4th 852, 869 (*Duncan*), as support for his assertion that the common-use requirement is assessed at step two of the *Bruen* analysis.  The *Duncan* dissent claimed *Bruen* was " 'somewhat ambiguous' " on this issue because it mentioned the common-use requirement at both steps of the analysis.  (*Duncan*, at p. 900 (dis. opn. of Bumatay, J.), citing *Bruen*, *supra*, 597 U.S. at pp. 32, 46.)  The dissent concluded that the common-use issue should be assessed at the second *Bruen* step because the first *Bruen* step concerns the " 'plain text' " of the Second Amendment, which does not have a " 'common use' " requirement, and the common-use inquiry is

30

tied to the " 'historical understanding of the Amendment,' " which is assessed at the second step. (*Duncan*, at pp. 900–901.)

We disagree with the *Duncan* dissent. First, *Bruen* itself decided the common-use issue at the first step of the analysis before shifting the burden to the government to justify the "proper cause" requirement at issue there. (See *Bruen*, *supra*, 597 U.S. at p. 24, 32–34.) Although the *Bruen* court also noted at the second step of the analysis that handguns "are indisputably in 'common use' for self-defense today," it did so in response to respondents' argument that colonial-era statutes prohibited the "bearing" of handguns because they were considered " ' "dangerous or unusual weapons" ' " at that time. (*Id.* at pp. 46–47.)

Second, even plain language must be viewed in its historical context. (See *Or. Dep't of Fish & Wildlife v. Klamath Indian Tribe* (1985) 473 U.S. 753, 774 ["even though 'legal ambiguities are resolved to the benefit of the Indians,' . . . courts cannot ignore plain language that, viewed in historical context and given a 'fair appraisal', . . . clearly runs counter to a tribe's later claims"].) *United States v. Miller* recognized this principle when it held that the Second Amendment must be interpreted according to the purpose with which it was originally adopted, which was to maintain a "[m]ilitia." (*United States v. Miller*, *supra*, 307 U.S. at p. 178.) The *United States v. Miller* court determined the meaning of "[m]ilitia" based on the historical understanding of that term and concluded that "the Militia comprised all males physically capable of acting in concert for the common defense" and that "these men were expected to appear bearing arms supplied by themselves and of the kind *in common use at the time*." (*Id.* at p. 179, italics added.)

*Heller* reaffirmed this common-use limitation on the scope of the Second Amendment, noting that *United States v. Miller*'s interpretation was

31

"fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " (*Heller*, *supra*, 554 U.S. at p. 627; see also *id.* at pp. 634–635 ["[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them"].) Thus, "*Heller* stressed that text and history are inextricably intertwined; the constitutional right is defined by the text used to immortalize it, but *Heller* also teaches that the text itself is defined by its original meaning, including the history and tradition behind it." (*Nat'l Ass'n for Gun Rights v. Lamont* (D.Conn. 2023) 685 F.Supp.3d 63, 88.) *Bruen* agreed with this approach: "Step one . . . demands a test rooted in the Second Amendment's text, *as informed by history*." (*Bruen*, *supra*, 597 U.S. at p. 19, italics added.)

Accordingly, we conclude that the common-use requirement is to be assessed at the first *Bruen* step, as it goes to the scope of the right, rather than to whether the regulation at issue is constitutionally permissible.

We further conclude that McCowan has the burden at the first *Bruen* step. Placing the burden on the party challenging the regulation at the first step of the analysis comports with " 'one of the first principles of constitutional adjudication -- the basic presumption of the constitutional validity of a duly enacted state or federal law.' " (*Lemon v. Kurtzman* (1973) 411 U.S. 192, 208; see *Nat'l Ass'n for Gun Rights v. Lamont, supra*, 685 F.Supp.3d at p. 89 [noting the "well-established principle that when Plaintiffs bring any constitutional challenge, . . . the burden shifts to the government to justify its actions once the Plaintiffs have satisfied their own preliminary burden"], citing *Kennedy v. Bremerton School District* (2022) 597 U.S. 507, 524.) Thus, it is McCowan's burden to establish that assault weapons are commonly used today for lawful purposes.

He has not met that burden. Citing two news articles and several federal court cases, McCowan argues that assault weapons are not unusual because "they are incredibly popular and common among Americans." We decline to rely on the factual conclusions in those sources absent evidence in the record before us regarding the popularity of assault weapons. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered' "], overruled on other grounds by *Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. 255, 264; *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1147, fn. 5 [concluding that news articles "are not proper authorities to establish the truth of the matters asserted therein"].) McCowan has presented no other evidence to support his claims that millions of Americans own at least one AR-15, which is apparently a type of assault weapon, and that millions of AR-15s are circulated within the country.

In any event, a finding that a weapon is in "common use" does not end the inquiry on *Bruen* step one. Rather, the question is whether the weapon is in " 'common use' . . . for *lawful purposes* like self-defense." (*Heller*, *supra*, 554 U.S. at p. 624, italics added.) To that end, McCowan asserts that assault weapons are not dangerous within the meaning of the phrase " 'dangerous and unusual.' " (See *Heller*, *supra*, 554 U.S. at p. 627.) He notes that an M-16, which the *Heller* court concluded was outside the scope of the Second Amendment (*id.* at pp. 625, 627), is fully automatic, meaning it "fires repeatedly with a single pull of the trigger," while AR-15s are semiautomatic because they fire only one shot with each pull of the trigger. (See *Staples v. United States* (1994) 511 U.S. 600, 602, fn. 1, 603.) Thus, he reasons, AR-15s

are in the same "semi-automatic class" of firearms as the handgun, which is protected by the Second Amendment. This argument also fails. *James* acknowledged the distinction between semiautomatic guns and fully automatic guns but concluded it did "not negate the fact that assault weapons, like machine guns, are not in common use by law-abiding citizens for lawful purposes. . . . [A]ssault weapons . . . are at least as dangerous and unusual as the short-barreled shotgun at issue" in *United States v. Miller*. (*James*, *supra*, 174 Cal.App.4th at pp. 676–677.) Because McCowan has not presented any evidence of the objective characteristics of assault weapons or their common uses, we cannot agree with McCowan that assault weapons are not particularly dangerous.

Finally, McCowan argues that *Bocanegra* improperly relied on the legislative purposes behind the regulations at issue in that case in determining that assault weapons were dangerous and unusual. He argues that by doing so, the court "supplanted the first step of the analysis" with the "means-end" test rejected by *Bruen*. McCowan appears to have reached this conclusion simply because *Bocanegra* included a paragraph in a section of its opinion entitled "The Second Amendment and Section 30605" which sets forth the legislative findings and purposes underlying the challenged statutes. (See *Bocanegra*, *supra*, 90 Cal.App.5th at pp. 1244-1245.) McCowan further asserts that *Bocanegra*'s reliance on *James* and *Zondorak* was misplaced because those decisions also discussed the legislative history of the challenged regulations. We reject this argument.

None of those decisions considered whether the challenged regulations were sufficiently tailored to the government's goal in enacting the regulations, and thus they did not employ the means-end test. (See *United States v. Rahimi*, *supra*, 602 U.S. at p. 706, fn. 1 (conc. opn. of Sotomayor, J.)

34

[describing the means-end test]; *Bocanegra, supra*, 90 Cal.App.5th at p. 1249 ["The *James* court neither discussed nor applied a means-scrutiny test as part of its analysis."]; *Zondorak, supra*, 220 Cal.App.4th at pp. 835–836 [noting that the means-end test is applied at the second step of the analysis but finding the first step dispositive].)  Rather, *James* relied, at least in part, on legislative findings regarding the characteristics of assault weapons, such as their " 'capacity for firepower,' " in determining that assault weapons were dangerous and unusual for purposes of the Second Amendment.  (*James, supra*, 174 Cal.App.4th at p. 676.)  McCowan does not present any authority suggesting it was improper for the *James* court to rely on legislative fact-finding in this context.

In any event, it was McCowan's burden to demonstrate that assault weapons are commonly used today for self-defense, and he failed to do so. Because McCowan has not shown that the first step of the *Bruen* analysis is satisfied here, we need not address his argument that there is no historical tradition of prohibiting the possession of assault weapons.

### 5. *Constitutionality of Section 32310*

McCowan contends section 32310, subdivision (a), under which he was convicted, is unconstitutional on its face because it violates the Second Amendment.  Section 32310, subdivision (a) prohibits the sale, purchase, or receipt of large-capacity magazines, which the Penal Code defines as "any ammunition feeding device" that can hold more than 10 rounds of ammunition.  (§ 16740.)  We conclude that McCowan has not met his burden on step one of the *Bruen* analysis, and thus his facial challenge to section 32310 fails.

At issue here is the threshold inquiry regarding whether the prohibited weapon is the sort of weapon protected by the Second Amendment.  (See

*Heller*, *supra*, 554 U.S. at p. 627, citing *United States v. Miller*, *supra*, 307 U.S. at p. 179.) While a magazine itself is not a firearm, the Second Amendment protects "operable" arms. (See *Heller*, at pp. 630, 635 [finding unconstitutional a requirement that firearms be "kept inoperable"]; *id.* at pp. 617–618 [explaining that the right to bear arms " 'implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use' "].) Thus, for example, " 'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." (*Jackson v. City & County of San Francisco* (9th Cir. 2014) 746 F.3d 953, 967, overruled on other grounds as stated in *United States v. Alaniz*, *supra*, 69 F.4th at pp. 1127–1128; see *Luis v. U.S.* (2016) 578 U.S. 5, 26 (conc. opn. of Thomas, J.) ["Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise."].)

Accordingly, some courts have found that magazines constitute "arms" under the Second Amendment because semiautomatic firearms require ammunition to be fed into it by a magazine to function as intended. (See *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. AG N.J.* (3rd Cir. 2018) 910 F.3d 106, 116 ["Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."], overruled on other grounds in *Bruen*, *supra*, 597 U.S. at pp. 18–19 & fn. 4; accord, *Hanson v. District of Columbia* (D.D.C. 2023) 671 F.Supp.3d 1, 10.)

Other courts have concluded that large-capacity magazines, as a specific subset of magazines, are not protected by the Second Amendment because they are not necessary for a firearm to function. (See *Or. Firearms Fed'n v. Kotek* (D.Or. 2023) 682 F.Supp.3d 874, 913 ["the evidence at trial shows that while magazines may be necessary to render firearms operable,

36

[large-capacity magazines], as a subset of magazines, are never necessary to render firearms operable"]; *Capen v. Campbell* (D.Mass. 2023) 708 F.Supp.3d 65, 89 ["But while magazines as a general class might be owed constitutional protection, [large-capacity magazines] as a specific subset of that class are never necessary for a firearm to function."]; *Ocean State Tactical, LLC v. Rhode Island* (D.R.I. 2022) 646 F.Supp.3d 368, 387 [concluding that large-capacity magazines are not "arms" under the Second Amendment and are not needed to operate a firearm].)

The Ninth Circuit recently agreed with those courts holding that large-capacity magazines were not protected by the Second Amendment. (*Duncan, supra*, 133 F.4th at p. 867.) In so holding, the majority concluded that magazines did not constitute "arms" under the Second Amendment, reasoning that at the time of ratification, "a clear distinction was recognized between weapons themselves, referred to as 'arms,' and accessories of weaponry, referred to as 'accoutrements.'" (*Duncan*, at p. 867.) The court found that large-capacity magazines fell within the latter category because they could not "reasonably be described as an item that a person 'takes into his hands, or useth in wrath to cast at or strike another.'" (*Ibid.*, quoting *Heller, supra*, 554 U.S. at p. 581.)

McCowan urges us to follow the *Duncan* dissent, which, in contrast to the majority, concluded that large-capacity magazines are "arms" under the Second Amendment. (*Duncan, supra*, 133 F.4th at p. 896 (dis. opn. of Bumatay, J.) The dissent reasoned that magazines are an integral component of certain firearms because those firearms "simply cannot fire as designed without a magazine." (*Ibid.*) It disagreed with the majority's characterization of magazines as an accoutrement, finding that "[n]o antebellum dictionary describes 'accoutrement' to include firearm

37

*components*." (*Id.* at p. 898.) Because, according to the dissent, "the Second Amendment's protection of 'Arms' must extend to their functional components," "magazines of all stripes, including those holding more than ten rounds, are protected." (*Id.* at p. 897.)

The foregoing cases reveal a few different approaches to the question of whether large-capacity magazines constitute "arms" under the Second Amendment. Many of the courts that concluded that large-capacity magazines were not protected by the Second Amendment focused on whether large-capacity magazines specifically, and not magazines in general, were necessary to operate the firearm as designed. (See *Or. Firearms Fed'n v. Kotek*, *supra*, 682 F.Supp.3d at p. 913; *Capen v. Campbell*, *supra*, 708 F.Supp.3d at p. 88; *Ocean State Tactical, LLC v. Rhode Island*, *supra*, 646 F.Supp.3d at p. 387.) In contrast, courts that have concluded that large-capacity magazines were "arms" under the Second Amendment looked to whether magazines in general were necessary to operate the firearm as intended or, in the case of the *Duncan* dissent, whether magazines constituted a "functional component[]" of the firearm. (See *Duncan*, *supra*, 133 F.4th at p. 897 (dis. opn. of Bumatay, J.); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. AG N.J.*, *supra*, 910 F.3d at p. 116; *Hanson v. District of Columbia*, *supra*, 671 F.Supp.3d at p. 10.) The *Duncan* majority took yet another approach, basing its conclusion on the historical understanding of what constituted "arms" versus "accoutrements." (*Duncan,* at p. 867.)

We need not decide which test is the correct one because McCowan has not presented any evidence regarding whether magazines constitute a functional component of firearms or whether they are necessary to operate those firearms as intended. He instead relies on the conclusions in the *Duncan* dissent. We decline to rely on the factual conclusions in that case

38

absent evidence in the record before us to support those conclusions. (See *Vons Companies, Inc. v. Seabest Foods, Inc.*, *supra*, 14 Cal.4th at p. 444, fn. 3.) Moreover, the *Duncan* concurrence emphasized that the authoring justice for the dissent improperly acted as a firearms expert and relied on facts outside the record in reaching his conclusions. (*Duncan*, *supra*, 133 F.4th at p. 884 (conc. opn. of Berzon, J.).)

Even if we agreed with the *Duncan* dissent that magazines constitute "arms" under the Second Amendment, that does not end the inquiry. As mentioned, whether the weapon at issue is " 'in common use' today for self-defense" is a question that must be answered at the first *Bruen* step. (See *Bruen*, *supra*, 597 U.S. at pp. 31–32.) Courts that have considered this issue with respect to large-capacity magazines have concluded that large-capacity magazines are not "typically possessed by law-abiding citizens for lawful purposes." (*Heller*, *supra*, 554 U.S. at p. 625; see, e.g., *Kolbe v. Hogan* (4th Cir. 2017) 849 F.3d 114, 124 & fn. 4, 137 [concluding that large-capacity magazines are not protected by the Second Amendment because they "are clearly most useful in military service"], overruled on other grounds in *Bruen*, *supra*, 597 U.S. at pp. 18–19 & fn. 4; *Bevis v. City of Naperville* (7th Cir. 2023) 85 F.4th 1175, 1195, 1197 ["assault weapons and high-capacity magazines are much more like machine guns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense"]; *Hanson v. District of Columbia*, *supra*, 671 F.Supp.3d at pp. 14–16 ["The Court finds that the Second Amendment does not cover [large-capacity magazines] because they are not typically possessed for self-defense"]; *Vermont Fed'n of Sportsmen's Clubs v. Birmingham* (D.Vt. 2024) 741 F.Supp.3d 172, 191, 197 [concluding that large-capacity magazines are not "presumptively" protected by the Second Amendment: "There is

substantial evidence in the record indicating that [large capacity magazines] are not commonly used for self-defense."].)

McCowan has not demonstrated otherwise.  Again, he relies on facts outside the record by citing the *Duncan* dissent and various news articles and surveys regarding the popularity of large-capacity magazines and their common uses.  Accordingly, his facial challenge to section 32310 fails.

### III.   DISPOSITION

The judgment is affirmed.


LANGHORNE WILSON, J.

WE CONCUR:


HUMES, P.J.
SMILEY, J.

*People v. McCowan* (A167545)

40

## A167545/The People v. McCowan

Trial Court: Superior Court of the County of Contra Costa, No. 04002033918

Trial Judge: Hon. John C. Cope

Counsel: Christopher Stansell and William M. Robinson, under appointment by the First District Appellate Project, for Defendant and Appellant.

     Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Bridget Billeter, Supervising Deputy Attorney General, and Jalem Z. Peguero, Deputy Attorney General, for Plaintiff and Respondent.